In re the MARRIAGE OF Ronald P. TAPPAN and Elaine L. Tappan.

Ronald P. TAPPAN, Appellant,

v.

Elaine L. TAPPAN, Respondent.

No. 18185.

Missouri Court of Appeals,
Southern District,
Division One.

June 25, 1993.

---

C. Ronald Baird, Mark J. Millsap, Dorr, Baird and Lightner, P.C., Springfield, for appellant.

Gail Berkowitz, Berkowitz & Cook, Kansas City, for respondent.

CROW, Presiding Judge.

By a decree entered April 24, 1992, the trial court dissolved the marriage of Ronald P. Tappan and Elaine L. Tappan. Ronald[1] appeals, presenting four points relied on, each of which pertains to maintenance awarded Elaine.

Ronald, born July 14, 1934, and Elaine, born May 15, 1933, married July 30, 1955. Three children were born of the marriage; all were emancipated at time of trial. The parties were residing in Missouri in July,

---

1. For brevity and clarity, we refer to the parties by their respective first names.

1988, when Elaine departed and established residence in South Carolina.

Ronald filed his petition for dissolution of marriage March 6, 1991. Elaine filed her answer and cross-petition April 8, 1991.

In a "Marital Settlement and Separation Agreement" dated April 17, 1991, the parties resolved all issues except (1) disposition of Ronald's pensions, (2) maintenance for Elaine, and (3) payment of Elaine's attorney fees. Those subjects were litigated at trial, January 2, 1992.

The trial court's adjudication of issues 1 and 3 is not attacked in this appeal. However, the pensions are pertinent to the maintenance issues; consequently, we must consider the pensions.

Ronald, a college graduate, worked thirty years for U.S. Steel Corporation, retiring in 1984 as vice president of sales. At trial, he testified he receives a pension from that company in the "gross" amount of $4,222 per month. However, he explained the benefits will decrease when he reaches 62 in that they will be "offset by Social Security."

In 1985, Ronald became employed by Paul Mueller Company in Springfield, Missouri. At time of trial he was executive vice president. He has a vested pension with that company; however, it will pay him nothing until he reaches 65.

The decree awarded Elaine half the U.S. Steel pension. In a "Qualified Domestic Relations Order," the trial court directed that Elaine's share be paid directly to her, finding that sum to be $2,311 monthly.[2] Neither party disputes that amount.

The decree contained this provision regarding the Paul Mueller ("PMC") pension:

[Elaine] shall receive fifty percent (50%) of the monthly pension benefits based on the following computation:

$$50\% \text{ times monthly pension benefit} \times \frac{\text{\# months [Ronald] has worked for PMC up to and including January 1, 1992.}}{\text{\# months [Ronald] has worked for PMC at the time of retirement}}$$

Per the separation agreement, Ronald bought Elaine a $162,000 home in South Carolina. Payments on the mortgage by which he financed the purchase include taxes and insurance, hence she is spared those expenses. The separation agreement requires Ronald to maintain a life insurance policy on himself, payable to Elaine, in an amount equal to the mortgage debt.

Additionally, Elaine received some $123,000 marital cash under the separation agreement. She used about $23,000 to furnish her home and for other expenses. At time of trial, the remaining $100,000 was invested, earning 5.8 percent annual interest.

When the parties separated, Elaine had a new Pontiac Grand Prix. A month before trial, she traded it in on a new 1991 Grand Prix, borrowing the difference ($5,000) from her mother. Elaine expected to repay her mother within ten months.

Elaine, a college graduate in business administration, was never employed outside the home during the marriage and sought no employment after the separation. Her activities at time of trial included volunteer work, church functions, aerobics and golf.

Elaine testified she has a "very low immune system" and was sick with bronchitis five months in 1991. However, she had not

---

**2.** This is obviously more than half the "gross" amount testified to by Ronald. We infer from the record that the parties submitted post-trial information to the trial court validating this sum.

been hospitalized since the separation. Elaine admitted she has no ailment preventing her from working part-time, but opined, "I don't think I have any skills to make enough money to support myself."

After the separation, Ronald sent Elaine $1,500 per month and paid her automobile insurance. His health insurance paid some of her medical bills.

Elaine sought no temporary maintenance.

At trial, she presented an itemized list of her monthly expenses, totaling $4,588.42. The trial court accepted most items, but found duplication in one, found another inflated, and rejected another as unnecessary. Declaring a goal to provide Elaine a "reasonable but comfortable income," the trial court determined Elaine's reasonable monthly living expenses were $2,578. The trial court then announced:

> Let's round it at 2500 and add another 500 on there for a cushion ... it seems like to me if she had $3,000 worth of disposable income a month, she'd be in very reasonable shape, and then, of course, she could increase that if she wished by taking employment, but she wouldn't have to.

After declaring Elaine should be allowed to "hang on to her interest income," the trial court asked counsel to compute the sum which, added to Elaine's share of the U.S. Steel pension, would provide her $3,000 per month "after taxes." Counsel subsequently determined maintenance of $1,681 per month would achieve that objective.

The decree awarded Elaine that sum.

Ronald's first point complains the maintenance is excessive in that Elaine's reasonable needs were shown to be $2,578 per month, she receives $2,311 per month from the U.S. Steel pension, and she was receiving $483 per month investment income (interest on her $100,000) at time of trial. Ronald points out the latter two figures total $2,794, some $200 more than Elaine's monthly needs.

Ronald asserts that inasmuch as Elaine is in the 28 percent income tax bracket, she needs only an additional $678 per month for federal and state income taxes to provide her $2,578 per month "after tax" income.

Ronald acknowledges Elaine is not required to consume her share of the marital property before receiving maintenance, and he does not argue she should receive none. Indeed, at trial he conceded she should receive monthly maintenance "somewhere between five hundred and a thousand dollars." However, Ronald emphasizes that the income Elaine earns from marital property received in the dissolution should be considered in determining the amount of maintenance. *Drikow v. Drikow,* 803 S.W.2d 122, 127–28 (Mo.App.E.D.1990); *Kacich v. Kacich,* 785 S.W.2d 606, 608[3] (Mo.App.E.D.1990); *Kinder v. Kinder,* 777 S.W.2d 339, 341–42[2] (Mo.App.W.D.1989).

Elaine responds that a trial court has substantial discretion in awarding maintenance, *Hoffmann v. Hoffmann,* 676 S.W.2d 817, 828[19] (Mo. banc 1984), and Ronald has the burden of demonstrating an abuse of discretion. *Harris v. Harris,* 784 S.W.2d 630, 631[2] (Mo.App.W.D.1990); *Woods v. Woods,* 713 S.W.2d 292, 294[4] (Mo.App.E.D.1986). Elaine reminds us that the statutory factors to be considered in awarding maintenance include the comparative earning capacity of each spouse, § 452.335.2(3) [3]; the standard of living established during the marriage, § 452.335.-2(4); and Ronald's ability to meet his needs while meeting hers, § 452.335.2(8).

Elaine cites evidence that Ronald's "gross pay" from Paul Mueller Company in 1991 (the year preceding trial) was $186,000, which allowed him to reinvest his investment income (his bonds, stocks and individual retirement accounts totaled "just under half a million").

Elaine notes the following passage from *Brueggemann v. Brueggemann,* 551 S.W.2d 853, 857[4] (Mo.App.1977):

> In a marriage of lengthy duration where one spouse has foregone career development, the marital standard of living may

---

**3.** References to statutes are to RSMo Cum.Supp. 1991 except where otherwise indicated.

serve as an important guide in computing the spouse's reasonable needs. In a very practical sense it is frequently the best evidence of what the parties have together determined their "reasonable needs" to be.

Elaine testified she did not work outside the home during the marriage because the family moved a lot and she was busy raising the children and keeping the household organized. Additionally, as Ronald ascended the corporate "ladder" she traveled with him to several conventions a year and engaged in business-connected entertaining.

Ronald did not dispute that testimony, but avowed that after the children were grown he encouraged Elaine to work outside the home, "not for the income … but just … it would be something she could do."

Elaine refers us to *Richardson v. Richardson,* 803 S.W.2d 45 (Mo.App.E.D.1990), for the proposition that a maintenance award will be upheld even though the maintenance combined with the receiving party's investment income from marital property slightly exceeds the sum which the trial court found to be such party's reasonable needs. While that is the holding, we observe the case was an appeal by the recipient that the maintenance was inadequate, not an appeal by the payor that the maintenance was excessive.

Elaine insists that because Ronald can meet all his needs and obligations out of his Mueller earnings, without having to spend his investment income, it is inequitable to include her investment income in calculating the maintenance she should receive.

The trial court was mindful of Ronald's superior earning capacity, as manifested by this comment:

> … I have to consider … that Mr. Tappan makes more money, but he works. And Ms. Tappan … doesn't. She gets to be retired today while Mr. Tappan doesn't get to retire for another five years or whatever it is. She doesn't have any kids to raise now. She doesn't have to entertain for him now. She

doesn't have anything to do but take it easy, unless she wants to.

As reported earlier, the trial court found Elaine could increase her income by obtaining employment.

Elaine testified her monthly expenses reflect a "far less luxurious lifestyle" than she enjoyed before the separation. However, we are told in *Hahn v. Hahn,* 739 S.W.2d 763, 764 (Mo.App.E.D.1987), that reasonable needs do not automatically equal the standard of living established during the marriage.

Endeavoring to rule Ronald's first point in harmony with the cases discussed above, we hold the trial court abused its discretion in awarding Elaine $1,681 per month maintenance. The trial court found her reasonable monthly living expenses were $2,578. That finding is adequately supported by the record. The trial court was not compelled to believe Elaine's evidence that her monthly needs totaled $4,588.42. *L.E.B. v. J.L.B.,* 768 S.W.2d 638, 640[2] (Mo.App. E.D.1989). In this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part or all of their testimony. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988); *In re Marriage of Vinson,* 839 S.W.2d 38, 42–43[3] (Mo.App.S.D.1992).

After finding $2,578 would meet Elaine's reasonable monthly needs, the trial court awarded her more maintenance than necessary to provide that sum.

■ First, the trial court decided Elaine should not use her investment income to meet her needs, but should instead be allowed to reinvest it. According to *Heins v. Heins,* 783 S.W.2d 481, 483 (Mo.App.W.D. 1990), that was error, as maintenance must be limited to the demonstrable needs of the party receiving it and not provide an accumulation of capital. *Accord: Buder v. Buder,* 824 S.W.2d 483, 485[5] (Mo.App.E.D. 1992).

Second, the trial court decided Elaine should have a "cushion," inferably to meet unforeseen needs should they arise. The trial court concluded $3,000 per month disposable income—exclusive of Elaine's in-

vestment income—would supply a cushion. To provide this sum, the trial court put into the maintenance award an amount sufficient to pay Elaine's federal and state taxes.

While neither party cites a case where a maintenance award specifically included funds calculated to pay the recipient's taxes, there are cases where that was the effective result. For example, *In re Marriage of Zavadil*, 806 S.W.2d 506 (Mo.App. E.D.1991), was a dissolution case in which the trial court, in determining the amount of maintenance, took into account the receiving party's "net take home pay." *Id.* at 512[15]. By doing so, the court was obviously considering what amount of maintenance, coupled with the recipient's "after tax" income, would meet her needs. The result was that the payor was reimbursing the recipient for the amount withheld for taxes from the latter's earnings. The maintenance award was affirmed.

In *Williams v. Williams*, 753 S.W.2d 101 (Mo.App.E.D.1988), the opinion notes the wife was employed earning a "net monthly income" of about $521. *Id.* at 102. We infer this was her "after tax" earnings. The opinion relies on this figure in its analysis affirming the maintenance award.

 *Zavadil* and *Williams* convince us the trial court did not err by considering Elaine's income tax liability in determining the amount of maintenance which, added to her other income, would supply sufficient funds for her reasonable needs. However, we do find an abuse of discretion in the trial court's inclusion of a "cushion" exceeding $400 per month in the maintenance award.

We recognize that determining a party's reasonable needs is an exercise in which competent trial judges may reach differing results on the same evidence. Additionally, given Ronald's income-producing ability, it is understandable that the trial court wanted to ensure it did not award Elaine less maintenance than she genuinely needs.

 However, having found Elaine's needs could be met with $2,578 disposable income per month, the trial court abused its discretion by awarding maintenance calculated to provide Elaine $3,000 per month "after tax" income (exclusive of her investment income). If Elaine's $483 per month investment income is added to the "after tax" income of $3,000, she has disposable income totaling $3,483 each month with which to meet monthly needs of $2,578.[4]

The trial court was obviously aware, as are we, that interest rates fluctuate, thereby affecting Elaine's investment income. The trial court was also obviously mindful that unexpected expenses occasionally arise, requiring additional income. We are too. Therefore, we do not hold the trial court should have allowed Elaine only enough maintenance to provide disposable income of $2,578 per month.

However, we do hold it was an abuse of discretion to (a) disregard Elaine's investment income in calculating maintenance, and (b) build into the maintenance award a monthly excess of more than $400 in disposable income, exclusive of the investment income.

A document in the legal file shows an accountant calculated it will require $990 per month to pay Elaine's federal and state income taxes. Accordingly, maintenance of $1,000 per month will pay her taxes and leave her $2,804 per month disposable income[5] to meet usual needs totaling $2,578. This provides over $200 per month for emergencies and to replace reduced investment income.

Based on the above analysis, we hold maintenance of $1,000 per month is the outer limit of acceptable judicial discretion in this case. We therefore modify the decree by reducing the monthly maintenance

---

**4.** We glean from the record that the maintenance of $1,681 per month was calculated to include sufficient funds to pay *all* of Elaine's federal and state income taxes, including those on her investment income.

**5.** $2,311 U.S. Steel pension; $483 investment

to $1,000 per month. Rule 84.14.[6]

We next consider Ronald's third point, which reads:

The trial court erred in failing to rule that any periodic maintenance would be payable only up to [Ronald's] retirement in that [his] uncontradicted testimony was that [he] intended to retire at age 62 and he was 58 at the time of trial and the trial court's ruling was against the weight of the evidence and misapplied the law. . . .

Ronald bases this point on his testimony that he intends to retire at age 62. However, the trial court was not obliged to believe that testimony. *Herbert*, 757 S.W.2d at 587[1]. Furthermore, upon reaching 62, Ronald may encounter incentives inducing him to continue working. Should he keep working, nothing in the record justifies terminating his maintenance obligation.

Additionally, when he retires, his investment portfolio may have grown to a point where his income will enable him to continue paying maintenance of $1,000 per month. Finally, nothing in the record demonstrates Elaine's needs will be fewer when Ronald retires than they were at time of trial.

■■■ A decision to limit maintenance is justified only where substantial evidence exists of an impending change in the financial condition of the parties; at a minimum, there must be substantial evidence to support a reasonable expectation that such a change will occur. *Whitworth v. Whitworth*, 806 S.W.2d 145, 148 (Mo.App.W.D. 1991); *May v. May*, 801 S.W.2d 728, 731 (Mo.App.E.D.1990). Absent evidence that the financial prospects of the party receiving maintenance will improve in the future, no maintenance award for a limited duration should be entered; it should be of unlimited duration, the amount being subject to modification if such party's financial condition improves. *In re Marriage of Runez*, 666 S.W.2d 430, 433–34[11] (Mo.App. S.D.1983); *Poague v. Poague*, 579 S.W.2d 822, 824 (Mo.App.W.D.1979).

income; $10 surplus maintenance.

■■ The cases cited by Ronald in support of his third point are too different factually from the circumstances here to be controlling. Ronald's third point is without merit.

■■ We turn now to his second point; it reads:

The trial court erred in failing to offset Social Security benefits received by [Elaine] when she elects to receive the same against any periodic maintenance award to the extent the Social Security benefits received increase the monthly amount received by [Elaine] from her U.S. Steel pension . . . as such ruling was a misapplication of the law . . . because under existing law [Ronald] is entitled to a dollar for dollar credit against monthly maintenance awards when, and if, received.

Arguing this point, Ronald refers us to his evidence that Elaine can begin drawing Social Security benefits at 62. Ronald's contention, as we understand it, is that if (a) Elaine begins receiving Social Security benefits, and (b) those benefits coupled with what she is then receiving from U.S. Steel exceed $2,311 per month, he should receive a dollar's credit against his maintenance obligation for each dollar by which the total of Elaine's Social Security and U.S. Steel benefits exceeds $2,311 per month.

Of the cases cited by Ronald in support of this point, only one, *Hogan v. Hogan*, 796 S.W.2d 400 (Mo.App.E.D.1990), allowed a maintenance payor a dollar-for-dollar reduction in his maintenance obligation for Social Security benefits received by the maintenance recipient. We find two significant differences between *Hogan* and the instant case.

First, the trial court in *Hogan* included in the dissolution decree a provision for Social Security credit against maintenance, and the maintenance recipient claimed this was error. Thus, the issue before the appellate court in *Hogan* was whether it was wrong

6. Rule references are to Missouri Rules of Civil Procedure (1993).

to *allow* the offset. Here, Ronald cited *Hogan* to the trial court, but the court did not allow Ronald a Social Security offset. Thus, the issue before us is whether it was wrong to *deny* the offset.

The second, and most important, difference between *Hogan* and the instant case is that it did not appear the recipient's other income in *Hogan* would change when she became eligible for Social Security benefits.

Here, as reported earlier, Ronald testified his U.S. Steel pension benefits will decrease when he reaches 62, as they will be offset by Social Security. From the record, we cannot ascertain the amount of the reduction, nor can we determine whether Elaine will also receive fewer dollars from U.S. Steel when Ronald reaches 62.[7] Nothing in the record warrants an assumption that she will continue receiving $2,311 per month. Ronald does not suggest the decree should provide an automatic increase in Elaine's maintenance if, when he reaches 62, the portion of the U.S. Steel pension received by her drops to a level where it, combined with any Social Security benefits she receives, falls below $2,311.

We recognize it is desirable for a dissolution decree to be crafted in a way that minimizes the need for future modification proceedings. However, our discussion of Ronald's third point, *supra*, enumerates a number of unpredictables in the parties' futures—too many for us to convict the trial court of abusing its discretion in denying the Social Security offset requested by Ronald's second point. The point is denied.

Before leaving the point, we note the decree specifies the maintenance award is modifiable. § 452.335.3. Accordingly, if the future brings a substantial and continuing change in the parties' circumstances such that a Social Security credit against Elaine's maintenance is warranted, Ronald may seek such a modification.

Ronald's fourth, and final, point reads:

The trial court erred in awarding [Elaine] retroactive support and maintenance from April 1, 1991, to December 31, 1991, because [she] did not seek temporary maintenance during said period of time and did not file any motions requesting periodic maintenance *pendente lite* and section 452.335 R.S.Mo. does not authorize retroactive maintenance and as such the trial court misapplied the law
. . . .

This point, as we grasp it, attacks the following sentence in the decree:

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Petitioner shall pay to Respondent the sum of $11,-200.00 as and for maintenance and one-half the U.S. Steel Pension from April 1, 1991, through and including December 31, 1991.

While the above sentence is followed by other sentences in the same paragraph of the decree, we infer from the argument following Ronald's fourth point that only the quoted sentence is challenged. We therefore consider it alone in our ruling on the fourth point.

As we have seen, Elaine filed her answer and cross-petition for dissolution of marriage April 8, 1991, but she never moved for temporary maintenance.

Ronald cites *C.M.D. v. J.R.D.*, 710 S.W.2d 474 (Mo.App.E.D.1986). There, a husband voluntarily provided his wife some support while their dissolution case was pending in the trial court. Although the wife moved for temporary maintenance, her motion was never heard. The decree awarded her $18,000 "retroactive maintenance." On appeal by the husband, the court held the award was error, explaining that the maintenance statute (then § 452.335, RSMo 1978) spoke prospectively, not retrospectively. 710 S.W.2d at 479[12]. Consequently, if the wife was dissatisfied with

---

**7.** Another uncertainty about the U.S. Steel pension was revealed in a comment by Ronald's lawyer during oral argument. Counsel stated the U.S. Steel pension has a cost of living adjustment among its provisions. The day after argument, Ronald's lawyer sent a letter to this Court conceding the "actual plan" was not submitted in evidence at trial and in fact contains no provision for cost of living adjustments.

**370**

the support her husband was providing during the litigation, her remedy was to seek a ruling on her motion for temporary maintenance. *Id.* Her failure to do so waived any claim she may have had for more support during that period. *Id.*

*C.M.D.* was cited and applied in *Kessler v. Kessler*, 719 S.W.2d 138 (Mo.App.E.D. 1986). There a dissolution decree awarded the wife maintenance retroactively for the eight-month period immediately preceding trial. The appellate court disallowed the award, holding § 452.335, RSMo 1978, authorized only prospective maintenance.[8] 719 S.W.2d at 140[5].

*C.M.D.* and *Kessler* support Ronald's contention that the trial court lacked authority to award Elaine, in the dissolution decree, maintenance for the period from April 1, 1991, through December 31, 1991.

Elaine tacitly acknowledges the trial court had no authority to award retrospective maintenance, but suggests the trial court "intertwined its maintenance award with a portion of its property award (the U.S. Steel pension)." Elaine endeavors to justify the $11,200 award as a "retroactive" property award. Her theory is that inasmuch as the U.S. Steel pension payments Ronald received from April 1, 1991, through December 31, 1991, constituted marital property, which he kept, the trial court was authorized to award part of it to her. Elaine cites a statement in *Doyle v. Doyle*, 786 S.W.2d 620, 622 (Mo.App.S.D. 1990), that if there is substantial evidence that one spouse squandered marital property, the trial court is authorized to order reimbursement.

We find that rule inapplicable here. From April 1, 1991, through December 31, 1991, while Ronald was receiving the U.S. Steel pension, he was providing Elaine $1,500 per month for her living expenses. There is no evidence he "squandered" the

pension or any other marital property. Additionally, in Elaine's testimony, we find this:

Q. ... You are asking the Court to award you maintenance retroactive, is that correct?

A. Yes.

We hold the $11,200 award is retrospective maintenance, not a "retroactive" division of marital property.[9] As the trial court lacked authority to grant retrospective maintenance, the award must be disallowed.

The decree is modified by (1) reducing the award of periodic maintenance for Elaine from $1,681 per month to $1,000 per month, and (2) deleting the sentence awarding Elaine $11,200 "as and for maintenance and one-half the U.S. Steel Pension from April 1, 1991, through and including December 31, 1991." As thus modified, the decree is affirmed.

PARRISH, C.J., and SHRUM, J., concur.

8. Section 452.335, RSMo 1978, was carried forward unchanged in RSMo 1986. It was amended by Laws of Missouri 1988, H.B. Nos. 1272, 1273 and 1274, pp. 951–67. Retrospective maintenance is unmentioned in the current version.

9. The proper date for valuing marital property in a dissolution proceeding is the date of trial. *Taylor v. Taylor*, 736 S.W.2d 388, 391[2] (Mo.

banc 1987). Here, there was no showing that the marital property, on the date of trial, included any funds traceable to U.S. Steel pension payments received from April 1, 1991, through December 31, 1991. Therefore, the record does not demonstrate there was any such property to value or divide.